Mr. Brown, good morning, your honor, may it please the court, government counsel, Lawrence Brown representing appellant Timothy Dale Jackson. We've got just the one issue, the right to counsel of one's choice here. John Markham was retained by Mr. Jackson. Mr. Markham was admitted in this matter at the district court level pro hoc vice. So we start out with a presumption that Markham should represent Jackson in this case. That presumption can only be overcome by a showing of actual conflict or of serious potential conflict of interest. I'd urge the court that this case isn't like the cases relied upon by the district court, Garby and Perio. It isn't like the cases cited by the government in its brief, Cassiano, Martinez, Millsaps. In those cases, we had, with the exception of one case, well, the Newell case was a credit card fraud matter. All of the others are drug conspiracies of the sort where multiple defendants are charged. It's a common strategy where one defendant would plead guilty in the hope of getting a break under 5k1 typically at sentencing. This was not one of those cases. Kevin Hartshorn and Tim Jackson were longtime friends that communicated about this case literally for years. Kevin Hartshorn was ultimately called by the defense. The defense always intended to call Hartshorn to talk about or to testify relating to his founding of the Church of Compassionate Service, his understanding of the IRS regs, what he communicated to Mr. Jackson. So Hartshorn, whether he was a government witness or a defense witness, wasn't under indictment, wasn't a co-defendant, wasn't hoping for a lighter sentence. Based on his cooperation with the government, he was absolutely aligned with Timothy Jackson. That is not, there are a lot of lawyers that Mr. Jackson's had from start to finish, right? First, initial appearance, Cooper, goes to probably about five, and you're the last in the line, right? My recollection on that, Your Honor, is Melvin Cooper was local counsel for John Markham. Then Merida Coxwell from Jackson was in the case, and then I was the third. Markham, okay. Markham. Who filed the motion to suppress? Markham, as I recall. Markham did not file a motion to suppress because the motion to suppress says you've got to suppress every statement Jackson's made to the IRS. Why? Because there is a, quote, actual conflict. Yes, Your Honor, that was Mr. Coxwell, I misrecalled. Okay, so Mr. Coxwell felt that there's an actual conflict. That was the premise for his entire motion to suppress. It was the premise for that motion. So your position is that that filing was erroneous? You know, Mr. Coxwell is doing his best for his client, in my opinion. But then, am I correct that you were already on the case when the sentencing occurred? Yes, I- You filed the motion for downward departure. Correct, Your Honor. And in that motion, you said, oh, well, he should get a downward departure because of charlatans, that was your word, like Hartshawn. The church, and he was a victim of the church and Hartshawn. Well, that is also my opinion, Your Honor. So how can you take the position that Hartshawn is totally aligned with him if your position for the downward departure was that he was a victim of Hartshawn? At trial, the defense was, you know, under Cheek, a willfulness defense. That, you know, Mr. Jackson studied the regs. He interpreted the regs the way he interpreted them. He listened to Hartshawn, he wasn't willful as is required under the title 26 counts. So whether Hartshawn was a charlatan or not, in 2004 when he advised Jackson, Jackson relied in part on what Hartshawn communicated, Jackson relied on his interpretation. That's exactly the awkwardness. If Markham's the attorney for the man that your client's defense requires you to call a charlatan and a deceiver. How can Markham not have an impossible conflict? Add to that the 60 page ruling here points out that once you had the Garcia hearing or it turns out that the church is paying for the fees of Markham, that's a fact in this record. It is, your honor, yes, sir. Our defense at trial, your honor, wasn't that Jackson was victimized by Hartshawn. It was that Jackson wasn't willful because based on Jackson's review of the regs, other research, his interface with Hartshawn, he understood this to be okay. He was gullible and naive and. I believe that, your honor. Okay, so Markham would have had to have elicited that from Hartshawn, that you took advantage of a gullible and naive person. Well, but again, your honor, that wasn't our defense at trial. At trial, the defense was willfulness, that Jackson believed this was okay. No scienter. Correct, yes, sir. That's the same thing as I was tricked into it. Gullible guy, didn't have scienter. No, again, respectfully, your honor, at trial. And this vow of poverty, just as an aside, I did part of my undergrad at Boston College, which was a Jesuit institution. And I can recall one of the philosophy professors explaining the vow of poverty that he took when he became a Jesuit. He was a tenured professor at a major university, got a commensurate salary, but turned that over to his order, and the order provided living quarters and meals and other necessities of life. So similarly, Jackson did research, understood that the vow of poverty was a perfectly valid thing under the code. Part of what he relied on was his own research. Part of what he relied on was what was communicated by Hartshawn. So again, at trial, it wasn't that, in terms of the defense, it wasn't that Jackson took the position that I was victimized, I was gullible, I trusted the wrong guy. His position that was based on his diligence, which included a number of things, conversations with Hartshawn only being one of them, based on his diligence, he believed this was okay. We're in a dramatically different position months later at sentencing when we're seeking down variance from the guidelines, but again, at trial, respectfully, the defense wasn't at all that I didn't have to answer because I was gullible. Retrial position also was, even more adamantly than yours at sentencing, was that every single thing Jackson said to the IRS had to be suppressed. Why? Because Markham had an actual conflict of interest. So when Markham walked him into those meetings, Markham was defending the church, his other client, and Hartshawn, his other client, and getting this guy to admit to things that, in fact, Markham knew his church had deceived him into doing. That's the pretrial motion to suppress. Indeed, Your Honor. So that seems highly reinforcing of the district court's conclusion. I agree that it does, so I can't disagree on that. Counsel, your argument is specifically that the district court erred in its analysis of Markham's conflicts of interest. Is that your argument? It is, Your Honor, and again, relying on cases where an attorney is attempting to represent a defendant proceeding to trial and a co-defendant witness seeking to curry favor with the government by testifying against the defendant headed to trial. What was the district court's error in its analysis, specifically? Where did it err? Again, misapplying cases like Garby and Perillo v. Johnson. Those cases are distinguishable, again, based on what I just articulated a minute ago. In this case, Hartshawn wasn't under indictment, wasn't seeking a 5K1, wasn't seeking to point the finger at Jackson in the hope of getting a lighter sentence. Hartshawn, whether it was called by the government or the defense, intended to talk about his research of the IRS regs, his founding of the church, what he communicated to Jackson. At the end of the day, the defense called Hartshawn. The government didn't. So, again, Your Honor, our position is that the court misapplied the distinguishable cases, Garby and Perillo. The court also placed a lot of weight on a Utah ruling, district court in Utah, a partial summary judgment where Hartshawn was enjoined from providing certain tax advice in 2012. The essence of the defense was that Hartshawn had communicated with Jackson roughly 2003, 2004. So the court reasoned that the injunction in Utah put Markham in a spot where his cross-examination potentially of Hartshawn would be chilled because he wouldn't want to talk about Hartshawn to run afoul of the injunction in the Utah court. Conversations between Jackson and Hartshawn took place in 2004. So that was, I'd say, an erroneous fact-finding there. So, primarily, those two things, Your Honor, the misapplication of the distinguishable cases, Garby and Perillo, and the erroneous finding of fact based on the district court's interpretation of the Utah partial summary judgment. There were conversations after the indictment but before the injunction, is that right? Between Jackson and Hartshawn. I can't, as I stand here today, Your Honor, I can't remember when the indictment was. The injunction in the Utah matter was March of 2012, I believe, and I'm just drawing a blank on the date of the indictment as I... Okay, the indictment, Your Honor, was February of 14. The injunction in Utah, I believe, was March of 12. The relevant conversations between Jackson and Hartshawn were roughly 2004. The tax years at issue were 06 through 09, so any conversation, let's say, after October of 2010, the extension deadline for the 09 return, any conversations after October of 10 between Jackson and Hartshawn about whether Jackson should file or not, to me, are irrelevant. Well, if there are no further questions, we've just got that... I guess I have one, just legally. Wood v. Georgia. Yes, Your Honor. What case do you have that states that when a district judge finds out that the fees are being paid by another who has exposure but isn't yet indicted, Wood v. Georgia wouldn't allow the district court to disqualify? I mean, I think you have an important distinction. This isn't a Rule 44 case where there are co-defendants. He hasn't been indicted. Correct, Your Honor. It's just a third party paying fees. Correct, Your Honor. I do a lot of work, well, I guess at the appellate level, too, but I don't think it's altogether uncommon that a third party, whether it's a father, whether it's a boss, whatever, would pay a legal fee. In this case, Jackson was a member of the church, had taken the vow of poverty. His earnings went straight to the church. So for the time being, or as of the motion regarding the disqualification of Markham as of that moment and previously, the church had been paying the fees. Once Markham was disqualified, did Jackson have no money? Was he indigent? No. No, Jackson continued in his surgical practice. Oh, I see. So that's how he could pay for routine counseling. Correct. Correct. You know, again, I was retained at the trial level. My recollection is that fees came from Jackson and from Jackson's parents. So he wasn't totally reliant on the church, I think unlike the appellants in Wood. Thank you, Your Honor. May it please the court, I'm Ruth Morgan representing the United States. Dr. Jackson continued to participate in the Church of Compassionate Service and the complex financial transactions to hide his income up to and during trial. So the money was still being funneled through the Church of Compassionate Service and had to be authorized by Markham's other client, Kevin Hartshorne, in order to pay Dr. Jackson's legal fees. He never got out of the church, to my knowledge, was still running all of the money through those accounts on which Hartshorne was the authorized signatory. And Judge Oserden noted that, that another client of this lawyer is the sole person responsible for paying Dr. Jackson's attorney's fees for representing Jackson. But counsel's got a point, that that's not an uncommon circumstance. Third parties paying, father, or if in this case the government had different facts and was indicting and prosecuting a nun. Right. You would expect the church to pay and you don't want to have a rule going forward that the government gets an automatic conflict, that government can disqualify retained counsel who's been in the case a long time just because another entity is paying. That's not the rule. Right. But I think the distinction in this case is because the Church of Compassionate Service, as was found by the jury in our case and by the Utah District Court in the Tenth Circuit, was nothing more than a tax evasion fraud scheme. Right. But you didn't indict. This is not, there's no attempt. There's no conspiracy. There's no unindicted co-conspirators. In the district? No, no, Your Honor. So, so in other words, again, I'm worried about the rule going forward because you're not in a Rule 44 situation where you've indicted two people and it looks like one's paying for the counsel and you worry about it. That's correct, Your Honor. The only distinction I would make there is that Hartshorn was under criminal investigation by the criminal. And that's, that was proven at the hearing? Yes, Your Honor. The district court knew that Hartshorn was under investigation. So what's your best case that stands for the proposition that an actual conflict exists when a person, quote, under investigation is paying, is the third party paying? What's the best case applying Wood v. Georgia to that? I would have to refer to my brief, refer the court to my brief. I don't remember that you cited one and you can see the problem if the government agent takes the sand and just says, oh, well, that person who's paying, the father, we've got him under investigation too. Then the government can disqualify. No, Your Honor. I'm not saying that's the sole basis for disqualification. It was just one of the several things that the district judge looked at in making his ruling. It certainly wasn't. So what's the primary basis that an actual conflict exists here, if it's not the fee payment? The fact that Hartshorn was under criminal investigation for the exact same tax fraud scheme. He was the creator, the promoter, and he ran the entire fraudulent tax scheme that, for They are co-conspirators, essentially. Well, it would have been a lot easier in the case if you charged them. I'm not saying you had to. In the indictment, I noticed it said nominees and unknown others. Was there a bill of particulars that elucidated that that was Hartshorn? No, Your Honor. We did not have a bill of particulars. And also, that particular case would have been prosecuted by the U.S. Attorney's Office in the District of Utah. I'm trying to dodge the question, but it wasn't in our jurisdiction to charge him. Counsel, the case law doesn't require that the trial judge find that there is an actual conflict. Does it? No, it does not, Your Honor. Either an actual conflict or a serious potential for conflict, and that's exactly what the lower court found. There could be an actual and or serious potential. And there was in this case, in our opinion, because of all the factors, he's under investigation for the exact same crime. The district court found that he could be putting himself in some sort of civil liability because of the United States lawsuit in Utah against Hartshorn. If the district court hadn't disqualified, would that be a really big problem for the conviction up here on appeal? If Markham continued to represent him and he were convicted? That's exactly right, Your Honor. He could come back either on direct appeal or 2255, ineffective assistance of counsel. Look at these conflicts you had. That would be a huge problem, I would think. In any event, he is not entitled, was not entitled to his counsel of choice. Just the Sixth Amendment simply provides that he is, chooses his own counsel, but not one that has a conflict. And in this case, there were all the conflicts, as the court noted earlier, and I just wanted to point out the potential of conflict for civil liability on Hartshorn in the civil case. The fact that Hartshorn, excuse me, Markham represented at least two other so-called ministers of the Church of Compassionate Services that hadn't even submitted any waivers that previously represented them, as well as the church itself, where the lower court found that there would be inherently, inherently divided loyalties and to have to choose, Markham would, which questions to ask Hartshorn, which may or may not harm or help his defense of the defendant Jackson. Hartshorn's case or position could be damaged by extensive cross-examination by Mr. Markham and could potentially expose him to other charges, that is Hartshorn, cause him to commit at all. On the other hand, the lower court found if Markham chose to avoid rigorous cross-examination of Hartshorn, he could likely violate his duties as to defendant Jackson. These could be, all could be issues raised if Markham had been allowed to stay in the case. Again, the court, the lower court disagreed with Markham's argument that their defenses were aligned, not opposed, and there was no way for the district judge to know. This is trying to see into the future. You don't know what's going to happen in a criminal case. Is Hartshorn going to perhaps be offered some sort of cooperation agreement by the government or vice versa? Dr. Jackson, how do you advise two, one defendant that's been indicted, one that's under criminal investigation, how do you advise them in that situation? I mentioned the other two prior clients of Markham that could be potential witnesses that pose a serious potential for conflict. As far as the waivers, the court assumed that the waivers were valid, but that they were not sufficient to overcome the actual conflict or the potential, serious potential conflict. Dr. Jackson had competent counsel at trial and pretrial, although he may not have had his first choice. As Mr. Brown noted, he hired two experienced criminal defense attorneys from Jackson, Mr. Coxwell and Chuck Mullins. Shortly before trial, Dr. Jackson decided he wanted Mr. Brown to be his counsel instead and he wanted to let Mr. Mullins and his partner go, but the court said since it is so close to trial, we're going to require Merida Coxwell to stay and sit through trial since he'd seen all the discovery. So he had Mr. Brown, a very experienced criminal tax lawyer, as well as Mr. Coxwell throughout his trial. Remind me, when Markham was disqualified, the court had to sort of navigate until what time he could stop communicating? That's correct, Your Honor, and I think it ended up being about 30 days, but then the government, I got together with defense counsel at that time, Coxwell and Mullins, because they said we really need to talk to Markham because he does have this knowledge about the church, and we entered an agreed order saying that's fine and you can, but there  Did you get the Jenks discovery? Yes. I mean, we had . . . Was that after Markham was out? Was that the concern about the discovery limitation the court was trying to say? I was just concerned at the time of the hearing that if we gave all of the discovery to Markham right then, while he's still representing Hartshorn, who's under criminal investigation, the government's concern was where's that discovery going to go? Is it going to use it to help Hartshorn's case? Is it going to, you know, that was my concern, but we ended up not having any restriction whatsoever on them being able to meet with Mr. Markham and discuss the case with him and look at the discovery, so they had that benefit. The trial lasted six days. The government introduced 542 exhibits, including 100 spreadsheets that the special agent prepared to show all of these complex financial transactions. The defense introduced 267 exhibits, 28 witnesses testified. Even though he didn't have Mr. Markham, who was allegedly an expert on this tax fraud scheme, the church, he had adequate counsel and the district judge did not abuse its discretion in disqualifying him. In your brief, you didn't mention the motion to suppress the downward departure characterizations by defense counsel of an actual conflict. Is that because you agree with opposing counsel that that was a change theory and that we would stop our inquiry at the hearing? I think so, Your Honor. Yes, and that wasn't raised in their brief, and we did not, obviously, didn't. But you're saying we could or couldn't look at defense counsel's own characterization of this as a, quote, actual conflict. Well, it was, I think the court definitely could, and one thing I did want to point out. To the extent it helps you, you will agree to it. Yes, Your Honor. But what I wanted to point out was that as far as the victimization or the victim, Dr. Jackson being a victim, it was so obvious and so clear with the undercover tapes at trial and the search warrant evidence, Dr. Jackson sought out a tax evasion scheme. He is a tax protester, a sovereign citizen. There was just a ton of evidence in that regard at trial. Hartshorne did not come to him and say, join my church and take avowal of poverty. Dr. Jackson was out there looking for a way to get away with not paying his income taxes well before he even met Hartshorne. Internet research, he testified about it. He testified about all the things he had looked into. His wife testified. He was on the internet all the time looking at those things. He testified on the undercover tapes that he actually liked two other tax evasion schemes better than the Church of Compassion and Service because you had more control over your money. So he wasn't a victim in any sense of the word in the jury, I'm quite sure. About 90% of his income back? Yes, Your Honor. 90% came back. And that's, I think, another reason that Hartshorne wanted to keep helping Dr. Jackson because he was a huge cash cow for them. He was the biggest client, so to speak, or minister of that church. I think just for our four charged years, it was $3.69 million in gross income that he had, of which Hartshorne received 10%. So what was his trial? Did he testify at trial? Hartshorne? No, Jackson. Yes, he did, Your Honor. And his defense was, I didn't know because I was tricked, or what was it at trial? That he truly believed that this was a legitimate way, that he was tax exempt because he had given his money to the church, but there were a lot of holes in that testimony, one of which was he didn't even deed over the land, the $1.2 million farm, well until 2010, until he started getting tax letters that your property, the IRS is going to put a lien on your property. So he didn't really give all of his property over to the Church of the Compassionate Service. He did what he thought he could get away with to make himself look tax exempt and not have to pay taxes. And essentially, I think that's all I wanted to cover, unless the court had any other questions we would rely on our brief. Thank you. The one matter I'd like to address very briefly, the court asked if Mr. Markham had been allowed to represent Dr. Jackson through trial, where would we be if Dr. Jackson was convicted and appealed and raised the issue of Markham's conflict? And I'd urge the court in that situation that we had a very, very detailed waiver, you know, both Hartshorn and Jackson signed detailed waivers. They consulted outside counsel, each of them, different counsel, regarding the waivers. Dr. Jackson was an orthopedic surgeon, a very sophisticated, mature individual. So I would urge that, you know, again, based on that ... You're not sophisticated enough to know that this tax evasion scheme wasn't legal, it wasn't that sophisticated. He didn't know that, but he knew all about attorney waivers and conflicts. Point well taken, Your Honor. I would have advised against joining the Church of Compassionate Service. Me personally, Jackson, based on his research and his discussions with Hartshorn, thought this was bona fide. I've got nothing further. Thank you, Your Honors. The court will take a brief recess. Thank you, Your Honors.